[Crim. No. 6348. Fifth Dist. July 15, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
ANTHONY RAY BEASLEY, Defendant and Appellant.

---

**COUNSEL**

Jo Anne Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Gregory W. Baugher and Jana L. Tuton, Deputy Attorneys General, for Plaintiff and Respondent.

---

**OPINION**

**THE COURT.**\*—In March 1980, in Fresno County Superior Court action No. 249896-2, appellant was convicted on his guilty plea of possession of heroin (Health & Saf. Code, § 11350) and placed on three years felony probation. In March 1982, in Fresno County Superior Court action No. 279486-5, he pleaded guilty to grand theft person (Pen. Code, § 487). In May 1982, he was sentenced to prison for the 3-year upper base term for the grand theft plus a concurrent 16-month lower base term for the heroin possession. The judge rejected a defense request he initiate narcotics addict commitment proceedings (Welf. & Inst. Code, § 3051), finding insufficient evidence to believe that appellant "is addicted or in imminent danger of becoming addicted to the use of narcotics."

Appellant contends the judge abused his discretion in refusing to institute narcotics addict commitment proceedings as recommended by two probation officers, based on his statement he had been free-basing cocaine for the past six months, at a weekly rate of $600. Respondent counters the judge could dismiss appellant's claims of cocaine use in light of his previous denials of

---

\*Before Brown (G. A.), P. J., Woolpert, J., and Martin, J.

drug use in 1980 and 1982 plus three negative drug tests during the six-month period in question.

■ The obvious threshold question is whether cocaine users are eligible for California Rehabilitation Center (CRC). For reasons to be stated, we have concluded they are.

Welfare and Institutions Code section 3051 provides, in pertinent part: "Upon conviction of a defendant for any crime in any superior court, or following revocation of probation previously granted, and upon imposition of sentence, if it appears to the judge that the defendant may be addicted or by reason of repeated use of narcotics may be in imminent danger of becoming addicted to narcotics the judge shall suspend the execution of the sentence and order the district attorney to file a petition for commitment of the defendant to the Director of Corrections for confinement in the narcotic detention, treatment, and rehabilitation facility unless, in the opinion of the judge, the defendant's record and probation report indicate such a pattern of criminality that he or she does not constitute a fit subject for commitment under this section."

Welfare and Institutions Code section 3009, which, like section 3051, appears in Division 3 of that code, states: "A 'narcotic addict,' as used in this division refers to any person, adult or minor, who is addicted to the unlawful use of any narcotic as defined in Division 10 of the Health and Safety Code, except marijuana."

Health and Safety Code section 11019, which appears in Division 10 of *that* code, states, in pertinent part:

"'Narcotic drug' means any of the following, whether produced directly or indirectly by extraction from substances of vegetable origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis:

". . . . . . . . . . . . . . . . . . . . .

"(d) Coca leaves and any salt, compound, derivative, or preparation of coca leaves, and any salt, compound, isomer, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances, but not including decocainized coca leaves or extractions of coca leaves which do not contain cocaine or ecgonine." Section 11019, subdivision (d) defines cocaine. (See also, Health & Saf. Code, §§ 11032, 11055.)

While these various code sections combine to define "narcotics," none of them defines "addicted to narcotics." However, *People* v. *Davis* (1979) 92 Cal.App.3d 250 [154 Cal.Rptr. 817], where the court rejected various constitutional attacks on the punishment of possession, possession for sale, and sale of cocaine, contains this passage: "Appellants further contend that the classification of cocaine as a narcotic makes its proscription unconstitutional because cocaine users are denied the rehabilitative option of commitment to the California Rehabilitation Center (CRC) pursuant to Welfare and Institutions Code section 3051. Counsel for the parties in effect stipulated that a person is not a narcotic addict eligible for treatment at CRC if he is using cocaine and not any other drug or narcotic. The Legislature has determined that the CRC rehabilitation program shall be available to those who are addicted or in great danger of becoming addicted physically to a drug or narcotic. Cocaine is not physically addictive. There is a rational basis for treating heroin users and cocaine users differently for purposes of rehabilitation." (*Id.,* p. 260.)

Technically, this passage is dicta, since the parties never litigated whether section 3051's "addiction" must be a "physical addiction." Likewise, the court never resolved a conflict but merely accepted the parties' "stipulation" at face value. More to the point, we think *Davis* is simply wrong in its bland statement that cocaine users do not qualify for CRC.[1]

Among the various cases not mentioned in *Davis* is the watershed decision of our Supreme Court in *People* v. *Victor* (1965) 62 Cal.2d 280 [42 Cal.Rptr. 199, 398 P.2d 391]. There, the court held that section 3051's predecessor, Penal Code section 6500, authorizing a defendant's commitment as a person who "by reason of the repeated use of narcotics is in imminent danger of becoming addicted to their use," was not unconstitutionally vague. In so holding, the court construed the term "addicted" both in the context of depressant and stimulant drugs. As to the former, the court stated: "While no single definition of 'addiction' may be satisfactory for all purposes, there is general agreement that abuse of an addictive depressant drug (e.g., morphine, heroin, codeine, and other opium derivatives; at least certain of the morphine-like synthetic analgesics and the barbiturates and similar hypnotics) will tend to produce in the user the three characteristic mental and physical responses of the addiction process: i.e., emotional dependence, tolerance, and physical dependence." (*Id.,* p. 302.)

---

[1]Though respondent initially relied on *Davis,* in a response to our request for supplemental briefing, respondent conceded that *Davis* "does not appear to be consonant with the statutory scheme" and "has not been generally followed." Respondent has expressly withdrawn its former contention "that cocaine users are categorically ineligible for CRC." Nevertheless because of the importance of the issue and the confusion in the area we will detail the reasons for our holding.

As to the latter, the court explained: "It should be emphasized that the foregoing definition is over-inclusive with respect to certain addictive drugs of the 'stimulant' class: e.g., although a form of tolerance may be developed to amphetamines, physical dependence, as such, is not thought to be acquired through abuse of such drugs and there may be no specific abstinence syndrome upon withdrawal; and abuse of cocaine is generally held to result neither in tolerance nor in physical dependence. (Proceedings, White House Conference on Narcotic and Drug Abuse (1962) pp. 285-290.) Accordingly, addiction to such drugs—which can be as severe as opiate addiction—should be defined in terms of emotional or psychological dependence only." (*Id.*, p. 304, fn. 17.)

The court notes these salient features of emotional dependence: "*Emotional dependence* appears to be the result of a complex interaction of such factors as (1) deficiency or inadequacy of the preaddicted personality of the user; (2) initial effectiveness of the drug in relieving the user's feelings of insecurity or anxiety, whatever their source; (3) assimilation of the user into a drug-oriented group in which the conventional moral disapproval of narcotic abuse is rejected as 'square,' the pleasures of drug effects are overvalued, and rationalizations are provided to allay fears of becoming 'hooked'; and (4) progressive substitution of drug intake for normal forms of adaptive behavior until the user comes to believe the drug is the one and only panacea for all his real or imagined ills. (See Drug Addiction: Crime or Disease? *op. cit. supra,* pp. 50-64; Clausen, *Social and Psychological Factors in Narcotics Addiction* (1957) 22 Law & Contemp. Prob. 34, 38-50.) These and other factors may of course be of varying importance in any given case, according to the individual's psychological makeup and his familial and social environment; but it is generally agreed that when the stage of full emotional dependence has been reached, the user lives in a state of overpowering need or compulsion to periodically experience the effects of the drug and hence that its continued use becomes the primary support of and motive for his existence." (*Id.,* pp. 302-303; fn. deleted.)

In *People* v. *Bruce* (1966) 64 Cal.2d 55 [48 Cal.Rptr. 719, 409 P.2d 943], the Supreme Court elaborated on the showing required: "Although evidence of having experienced the abstinence syndrome immediately prior to arrest or commitment, or subsequently thereto, constitutes one of the proofs of addiction (*People* v. *Victor, supra,* 62 Cal.2d 280), it is not essential to a finding, for purposes of commitment pursuant to section 6451 of the Penal Code, that a person is either an addict or in imminent danger of becoming addicted if other evidence is sufficient to show repeated use of heroin to the extent that the person has failed to solve his problems by socially accepted methods and that he is emotionally or physically dependent upon narcotics and is, therefore, in the opinion of qualified examiners either

addicted thereto or in imminent danger of becoming so addicted." (*Id.*, pp. 64-65.)

Several cases under section 3051 follow *Bruce* and speak in the disjunctive of emotional *or* physical dependence. Thus, in *People* v. *Munoz* (1975) 51 Cal.App.3d 559 [148 Cal.Rptr. 165], this court observed: "While appellant has been confined in state prison for a period of almost two and one-half years, this circumstances [*sic*] does not preclude, per se, the finding that appellant is a narcotic addict or in imminent danger of becoming one; the use of narcotics in state prisons is not uncommon; also, appellant may have failed to solve his problem with drugs by socially accepted methods, and he still may be emotionally dependent upon narcotics." (*Id.*, p. 566.) (See also *People* v. *Murphy* (1969) 70 Cal.2d 109, 121-122 [74 Cal.Rptr. 65, 448 P.2d 945]; *People* v. *Carley* (1969) 276 Cal.App.2d 820, 823-824 [81 Cal.Rptr. 414]; *People* v. *Elmore* (1969) 272 Cal.App.2d 864, 868 [77 Cal.Rptr. 721]; *People* v. *Garcia* (1967) 256 Cal.App.2d 570, 575-576 [64 Cal.Rptr. 370].)

We are unaware of any statutory or judicial developments since *Victor* which undermine its definition of addiction for purposes of Welfare and Institutions Code section 3051.[2] Indeed, in *People* v. *Thomas* (1977) 19

---

[2]Numerous developments in the last 18 years have confirmed *Victor*'s assessment of the seriousness of cocaine addiction. A 1979 report by the White House Strategy Council on Drug Abuse estimated that 10 million Americans had taken cocaine within the preceding 12 months, compared with 10,000 people 20 years before. (Van Dyke & Byck, *Cocaine* (Mar. 1982) Sci. Am., at p. 128.) The National Narcotics Intelligence Consumers Committee has estimated 1980 United States cocaine imports at 40,000 to 48,000 kilograms, which puts the retail value of the industry at $27 to $32 billion. (*Ibid.*) "If the cocaine trade were included by Fortune in its list of the 500 largest industrial corporations, cocaine would rank seventh in volume of domestic sales, between the Ford Motor Company and the Gulf Oil Corporation." (*Ibid.*)

Dr. David Smith, founder and medical director of San Francisco's Haight-Ashbury Free Medical Clinic has called cocaine the "most addictive drug" in popular use. (Overend, *Middle Class Drug Abusers' New Trend: Cocaine . . . And Heroin*, L.A. Times (Feb. 1, 1983) p. V-1, cols. 5-6.) UCLA psychopharmacologist Ronald Siegal, a nationally known authority, estimated there are now 20 million cocaine users in the United States. (*Ibid.*) Treatment programs include self-help groups patterned after Alcoholics Anonymous in such places as San Francisco and Los Angeles (*ibid.*), voluntary in-patient hospital programs combining detoxification, drug education and intensive individual and group therapy (Daltry, *Drug Program: 21 Days, $7,000*, L.A. Times (Dec. 26, 1982) Calendar, p. 26, cols.1-2), and a National Cocaine Hotline (800-COCAINE).

Van Dyke and Byck discuss the opiate—stimulant distinction noted in *Victor, supra,* 62 Cal.2d 280:

"Is cocaine addictive? The question appears to call for a simple answer, but a yes or no reply does not do justice to the tangle of medical definition, folk wisdom, legal classification and social recrimination that is summarized by the word 'addictive.' One longstanding medically accepted definition of the term is derived from the description of opiate effects. For a drug to be considered addictive a person must develop tolerance for it, in the sense that repeating the same dose causes a diminishing response. Moreover, the drug must lead to

Cal.3d 630, 633, fn. 1 [139 Cal.Rptr. 594, 566 P.2d 228], the Supreme Court cited *Victor* as the definitive case on the meaning of the phrase "by reason of repeated use of narcotics may be in imminent danger of becoming addicted to narcotics." We hold a person is not ineligible for CRC where he is emotionally or psychologically dependent as defined in *People* v. *Victor, supra,* 62 Cal.2d 280 (or in imminent danger of becoming so) on cocaine.

■ With this threshold question resolved in appellant's favor, the question becomes whether the judge erred in refusing to initiate Welfare and Institutions Code section 3051 proceedings. For reasons to be stated, we will hold he did.

As noted, in early 1980, appellant was convicted of heroin possession, based on an incident in July 1979, in which he sold two balloons of heroin to an informant. The probation officer's report (RPO) prepared at that time contained appellant's denial of use or experimentation with any dangerous drug or narcotic other than marijuana. Appellant's terms of probation apparently included narcotics testing. At the time of sentencing in 1982, the judge read and considered both a special RPO in the earlier action and a new RPO in the current action. According to the new RPO, appellant said he started "snorting" cocaine at a rate of about twice a month in 1979. In late 1981, according to appellant, he began "free-basing" about $200 worth of cocaine, about three times a week. He had been free-basing, was under the influence of cocaine and needed cocaine when he committed the instant grand theft.

The RPO noted the author: ". . . has no information to contradict that statement of the defendant's narcotic use other than noting that narcotics tests taken on July 20, 1981, September 28, 1981, and January 15, 1982 were all negative. Despite those negative narcotics tests, it appears that

---

physical dependence, so that repeated doses are required to prevent the onset of a withdrawal syndrome.

"According to this definition, cocaine is not addictive. Cocaine users can take the same dose every day and get the same effect. There are withdrawal signs detectable on the electroencephalogram and in sleep patterns, but they are quite undramatic when compared with the withdrawal syndromes associated with opiates, barbiturates or alcohol.

"On the other hand, cocaine certainly is addicting within the broader sense of the term that has now been adopted by many pharmacologists. That is, cocaine is severely habit-forming." (Van Dyke & Byck, *op. cit. supra,* p. 140).

Dr. George R. Gay explains: "The chronic user begins to suffer severe depression when not 'wired' (this is the closest to a 'withdrawal' sign that is seen with cocaine). Intensified cocaine use supervenes. True tolerance is equivocal, but the user nonetheless obsessively steps up his/her pattern of use in a futile effort to overcome depression and fatigue." (Gay, *You've Come a Long Way, Baby! Coke Time for the New American Lady of the Eighties* (1981) J. Psychoactive Drugs, p. 305).

there is probable cause to believe the defendant is addicted or in imminent danger of becoming addicted to narcotics. Therefore, this officer is recommending that proceedings under Section 3051 of the Welfare and Institutions Code be initiated, for a possible commitment to the California Rehabilitation Center.''

The special RPO in the original action, written by a different deputy probation officer, also recommended initiation of Welfare and Institutions Code section 3051 proceedings. The special RPO contains a detailed summary of appellant's drug testing history:

"On November 1, 1980, Defendant Beasley was released from custody. On December 4, 1980, Mr. Beasley appeared in the Probation Office, and a weekly drug testing schedule was set up for the defendant. The defendant came into the office for testing on December 15, 1980 and on December 22, 1980, the results of these tests were negative. He missed testing each following week until February 9, 1981. Up to that date, several attempts were made to contact him regarding the matter of drug testing.

"On February 9, 1981, when the defendant finally appeared to test, he was instructed to test each Monday thereafter. He, however, tested next on March 9, 1981, after again missing several weeks. Between March 9, 1981 and May 18, 1981, Defendant Beasley tested negative on a weekly basis.

". . . . . . . . . . . . . . . . . . . . . .

"On June 25, 1981, the defendant was instructed to begin testing again. However, he tested only on July 20, 1981 and September 28, 1981.''

The author remarked: "Upon the defendant's release from custody in November of 1980, he showed very little desire to comply with a regular drug testing schedule, aside from the period between March of 1980 and May of 1980.''

At the May 3, 1982 sentencing hearing, the judge said he was "having some problem with the question of the defendant's alleged addiction.'' He noted appellant had denied any drug use in 1980 and that his tests had been negative. When defense counsel referred to appellant's statement, the judge asked "which story do I believe, though?'' After a debate as to the significance of the negative testing, this exchange followed:

"MR. SISK: [Defense counsel] . . . I think based upon Mr. Beasley's statement certainly there should be a, at least a consideration as to whether

or not he is addicted or in imminent danger. If he isn't certainly I am sure the doctors will tell us that.

"THE COURT: They will?

"MR. SISK: Well, that is what the statute mandates that we appoint them to determine that.

"THE COURT: The doctors will tell us whatever Mr. Beasley tells them, from my experience.

"MR. SISK: Well, then, be that as it may, I think they are in more of a position to decide than the Court is in terms of whether or not he is.

"THE COURT: You may be right but the legislature has given it to me to decide initially and at this point I don't believe he is addicted or in imminent danger. There is insufficient evidence of that. The evidence points in the other direction."

The judge refused to initiate section 3051 proceedings. He made no finding of excessive criminality and, indeed, that subject was not broached.

As appellant asserts, the record reflects the judge applied the wrong standard in refusing to initiate proceedings. The judge shall order the initiation of proceedings "if it appears to the judge that the defendant *may* be addicted or by reason of repeated use of narcotics *may* be in imminent danger of becoming addicted to narcotics. . . ." (Welf. & Inst. Code, § 3051; italics added.) The statute further provides for the defendant's examination by one—or if the defendant requests, two—physicians to determine whether the defendant is addicted or in imminent danger of addiction. If the report answers this question in the affirmative, further proceedings are required, at which point the judge must find whether the defendant *is*, not may be, addicted or in imminent danger of addiction.

In the instant case, the judge erred in prematurely applying, without benefit of a doctor's report, the ultimate standard instead of the preliminary standard. This error requires a remand for application of the correct test.

We note that the "may"—"is" distinction could be critical at the threshold stage of proceedings in cases such as the present one. ■ As the Supreme Court explained in *People* v. *Ortiz* (1964) 61 Cal.2d 249 [37 Cal.Rptr. 891, 391 P.2d 163]: ". . . the discretion thereby vested in the court should be exercised with a view to implementing, rather than possibly frustrating, the strong legislative policy disclosed by the enactments creating

and governing the narcotic addict rehabilitation program. That policy, responsive to the current medico-social approach to the issue of drug addiction [citation], favors inquiry into the addictive status of *all* criminal defendants whose record indicates the presence of an addiction problem." (*Id.,* at pp. 254-255.)

We do not decide whether the facts before the judge compelled initiation of proceedings. In arguing they did not, respondent relies heavily on the record of negative testing. There was no evidence as to the specific tests given and their possible limitations in terms of detecting the presence of cocaine. Moreover, appellant's off-again, on-again testing, which, in the words of the special RPO, "showed very little desire to comply with a regular drug testing schedule," suggests he may have "cleaned up" for the tests he *did* take and failed to show up for any others. We note also that the California Department of Corrections psychiatric evaluation provided to the trial court pursuant to Penal Code section 1170, subdivision (d), appears to accept appellant's claim of cocaine use in an August 11, 1982, interview.[3]

Finally, on remand, the judge should consider the questions of addiction—imminent addiction and excessive criminality in light of appellant's current situation (i.e., that of a person who has now spent over a year in prison). (See *People* v. *Lopez* (1978) 81 Cal.App.3d 103, 111-112 [146 Cal.Rptr. 165]; *People* v. *Munoz, supra,* 51 Cal.App.3d 559, 566.)

The judgments in actions No. 249896-2 and 279486-5 are affirmed and the matters are remanded for further proceedings consistent with this opinion.

---

[3]According to the evaluation: "He described a well established pattern of Cocaine use, including free-basing, and that participation in the commitment offense was directly related to his drug involvement. He denied any kind of psychiatric problems. He described himself as a social drinker. He believes that drug involvement has been the primary factor in his past criminal behaviour and he expressed his intention to abstain from the use of drugs in the future. [¶] Mr. Beasley, from the psychiatric point of view, can be considered mentally responsible for his behaviour. He has been heavily involved with the drug culture, using and selling, and it seems clear that his future social conformity would be contingent upon his ability and willingness to totally abstain from the use of drug substances and the prognosis in that regard does not seem very favorable. Conditions of parole, when applicable, should include close monitoring for drug use and a mandatory community based drug rehabilitation program."